Our second case for this morning is Hardeman v. Wathen. Good morning. May it please the court. I'm Stephen Rice from the Lake County State's Attorney's Office, and I represent Sheriff Mark Curran, former sheriff and former Chief of Corrections David Wathen. This civil rights comes to you today on the pleadings and based on an assertion of qualified immunity, and I don't want to hide the ball. I recognize what this court has recently reiterated, that cases that can be decided on the pleadings based on qualified immunity are rare. And I'm here to suggest this is exactly one of those rare cases. Can I just put something on the table at least to get you started? Your brief proceeds on the basis of the factual assumption that the amount of water the detainees were receiving each day, both for consumption purposes and for sanitary purposes, was, quote, adequate. And I really can't tell, looking at this complaint. Construing the complaint in the light most favorable to the opponent, maybe it wasn't. You say there are five water bottles a day. I've seen water bottles that are this big. I've seen water bottles that are that big. I've seen all kinds of water bottles. I did some quick arithmetic, and if you assume it takes 1.6 gallons to flush a toilet, and there are 500 people there and they all flush the toilet once a day, you're telling me you had 2,400 gallons of water available for toilet flushing. Obviously, it's not in the record. But my point is, construing this complaint, this just seems like a premature moment. You obviously have the right, once you're up on summary judgment, to move again for qualified immunity. The Supreme Court's made that quite clear, but this strikes me as disturbingly premature. Well, with regards to consumption, actually drinking water, I mean, we take from the cases, and the district court took from the cases, that lesser amounts have failed to state a claim. But we don't know how many ounces of water were in these bottles. And I can't supplement the record for you on that point, obviously. No, you can't. That's the problem. And the allegations are people were feeling dehydrated, and if you want to go back, if you want to put the drinking water to one side and think maybe 40 ounces of water is enough for somebody, you still have the sanitary issues, whether it's brushing your teeth or washing your face or flushing a toilet. The allegations are pretty vivid. I made the mistake of reading these briefs over lunch, which was not the smartest thing I ever did. Fundamentally, we view this case not as about water, but as about sanitation. And in part, the district court's opinion or ruling on the matter really focused it in on the sanitation issue. We are highly focused on about 24 cases that are primarily dealing with what you don't want to read at lunch. Correct. There are sanitation cases, many of them, although this is both. And another unresolved factual issue, again, this gets to your allegation that this was necessary. There's nothing in this record to indicate that the operators of the facility explored different options for installing this new water pump or water pumps that they needed, whether it was feasible to phase it in, whether they looked at the cost of bringing in porta-potties, whether they, again, a naked record. That turns to the reasonableness of the plan, though. No, it doesn't. It's, well, you're implying that this was the only plan, and that doesn't, you know, if people are forced to live with unflushed waste, that's a pretty harsh only plan. Don't misunderstand me and don't misunderstand my brief. I'm not for a moment suggesting that this was the only plan. That would be foolish. There are obviously many different ways to skin a cat, so to speak, bad analogy here. Please. But the fact of the matter is the plan on the pleading, on the face of the pleading, is an eminently reasonable plan. No, it isn't, actually. Or at least it's not. Let's get rid of the word eminently. Maybe if we were taking the facts most favorably to you, it is a reasonable plan, but that's not the lens that we use in these cases. I think the lens that we use is framed by the cases, a lot of cases out of the Seventh Circuit, but also nationally. And those cases do not suggest that five bottles of water, even if they're the smallest bottles of water that you find in a supermarket, is an inadequate amount to sustain an inmate who is, you know, not performing in the NCAA basketball tournament. They are in a sedentary jail facility where, over a short three-day period, nobody is going to be seriously harmed by that amount of water. We don't know that. I mean, I would say that's a fact that, you know, if you were on the other side, if somebody had brought a 1983 action, you might be saying you need medical testimony to support the proposition you just advanced. Maybe it's quite supportable. I don't know. Courts are not doctors. I would agree that if this case existed over a weeks-long or months-long, years-long period, if this was a systemic condition at the jail... Even three days? Why don't you need a medical opinion for three days? Because it's surprise logic. It's not plausible that over three days serious harm could come from... I am not at all sure you're right. Even setting that issue aside, it is a sanitation case, as you indicated a few moments ago. And we don't know, at this stage of the case, whether those barrels that were in the pond for the inmates to get water from for purposes of flushing their toilets were regularly replenished, and how big they were, and how much water was available. This is the math question that the Chief Judge just mentioned, whether they were large enough to provide enough water for the 500 inmates in this jail to properly flush their toilets. And the allegation is that they were not able to, that it was not sufficient, and that they were exposed to raw human waste for the duration of this three-day water shutdown. And we have to accept that. Exposed to raw human waste. I mean, they weren't exposed to any human waste like you see in these other cases where human waste is spread about the facility, spread about the cells where you have blood and dried food and things like that in the cell. It's clear what the cases mean by exposure to excrement. It is in the environment, not in a toilet. A toilet full of excrement for three days with flies buzzing around it, which they also allege, is an acceptable condition of confinement. They don't allege that every toilet was clogged. They allege that many of them were not able to be, I'll just say, cleared by the amount of water that was available. And I had many of the questions Judge Sykes just reviewed. I don't know how much water was in the tubs. I don't know if they were refilled. I don't know what kind of container was available for an inmate to take it back to his cell and try to clear out the toilet. The case is just not developed. Well, this is why I started off, obviously, by fronting the issue that I realize on qualified immunity, I have a narrow path to tread here. The core facts are that it was a short duration, short as compared to almost all of the other cases. There are some cases that exist in a short three-day frame, but most do not. Most are vastly longer. And the other thing that weighs in with regards to the shortness of the duration is that the jail had a plan. They mitigated it. Now, we can question others. Surely you would agree that if the jail's plan was, we're going to give you each five little eight-ounce bottles of water, and you're just going to have to do without flushing the toilets for three days, that that would be a problem. I'd say that was objectively unreasonable. Right. And so now we just have to ratchet it up in terms of hypotheticals. Their allegation is that you roughly left them in that same position because you didn't give them enough water to clear the toilets. And facts will develop this. We'll know after we get some depositions and get some information how much water was there. And was it just a matter of a couple of malfunctioning toilets that didn't work properly? Or is it a matter that it was just structurally an insufficient way to maintain fundamental cleanliness for a group of 500 people? Respectfully, though, that's just Monday morning quarterbacking a reasonable plan. No, it isn't. It is not. I mean, if your plan assumed that only 250 people needed to flush the toilet during the day, and, of course, you forbid everybody from flushing at night, and they can't flush if it's just urine, we would need to evaluate those facts. We don't know these facts. You are absolutely hinging this appeal on the adequacy of the sanitation water and also the adequacy of the consumption water. But I'm not doing that from a purely subjective perspective. I mean, if you look at the cases. But these are facts, aren't they? Yeah, but if you look at the cases, they contain facts like these. They contain durations of various degrees. There are plenty of three-day cases, too. I mean, you found cases that said 40 days. All right, if you had no toilet available to you for 40 days, I think we could all say that you wouldn't be here. But three days is a long time. Right. There are short-duration cases where inmates had to go to the bathroom on the floor because there was no toilet. I mean, that's the other part of the analysis is what are the conditions being alleged here, and how severe are they? And the conditions here, I'm not saying that they're comfortable. By no means. This case is certainly about inconvenience. Shutting off the water to a building, any building, is going to be extremely inconvenient. And the assumption that this is what you had to do. I mean, it is possible that the sheriff and his responsible people adopted an unreasonable plan, a plan that violated people's rights to fundamental cleanliness. This complaint, based on the cases that frame it, do not suggest that this is an unreasonable plan. That's the thing. And obviously, I hear what you're saying, that you don't know that. Because I don't know how much water was in the tubs. Well, you know, they were tubs this high, but obviously, again, I can't supplement the record on that. I take your point that there are many more facts that we would want to know. And I'm telling you, are you trying to tell me that there were 2,400 gallons of water per day? Well, I can tell you that they were constantly refilling the barrels of water. That is what they were doing. I mean, that's part of the plan. It's not in the record, and we don't know what it took to flush these toilets. I don't even know whether they're Sloan valve toilets or regular toilets or, you know, lots of questions. I mean, you can readily infer from the complaint that they could be flushed with gravity. And there were buckets of water available for that purpose. So the fact that not all of the toilets would flush, of course, that's going to be the case in some instances. But it didn't work, and the whole jail stunk, and insects came, and they became ill, dehydrated, sleep deprived, agitated, etc. Over a short three-day period. And I say short in light of the... And it's fine for that to happen? It's not fine, but it's inconvenient. It's not unconstitutional. What, dehydration? Dehydration is a serious medical condition. Jails die in Africa from it. It can absolutely be a serious medical condition over a longer period of time. There's no way that anybody is going to die of dehydration if they're given bottled water over a three-day period. You don't know that. Well, I know that nobody died. We need expert medical testimony. No one was sick. No one had diarrhea. Nobody... All of those things could have happened. But the constitutional requirement is that it's a serious deprivation, that serious harm arises. The serious harm here, I mean, the harm that they list, dehydration, migraine, headaches, dizziness, constipation, those can be serious. You can find cases where courts say those can be serious conditions, but not over three days. Not when the deprivation ends after three days. I think we have your point. I'll let you save a minute for rebuttal if you'd like. Okay, thank you. Thanks. Mr. O'Connor. Please support Kevin O'Connor for the appellees. The most important point I was going to bring out was this is a 12B6. The allegations that counsel focused on, and we have pretrial detainees, so we're dealing with people that are presumed to be innocent that are being subject to these conditions while they're being held in the jail simply because they can't afford to afford bail or they were denied bail. In this situation, we alleged a lot more. He talks about general malaise in his motion and everything else. And as your Honor pointed out, there's a lot more that was going on here. We're dealing with, they're talking about trying to flush toilets with a bucket of water. The person goes to the bathroom during the day and they're doing number two as opposed to just number one. It's not like they have a bucket next to them. You go to the bathroom. You then have to go take your dirty hands because you don't even have water to clean them unless you're going to use the few bottles they gave you to drink with to clean your hands. You're then taking those hands and the other inmates are dumping a barrel into this barrel with their dirty hands and then taking that over and trying to attempt to flush the toilet with one little bucket of water. Toilets are designed to flush. That's what they mean. Not just pour a little water on top and hope it goes down. It doesn't work that way. And that's why we have a tank on the back of a toilet that talks about the number of gallons you have. Even in our modern toilets, you've got one button for a light flush and two buttons for a heavy flush. If somebody has gone to the bathroom, oftentimes, unfortunately, if you're not feeling well or you have a lot of feces, you're going to need more than one bucket. You may have to flush once, twice, three times, but you're not going to get that opportunity to do. Counsel talks about just three days, and we're talking about not being able to flush a toilet. The case that they actually cited to, they cited to LaRue out of the Second Circuit, which was there was a hole in the floor where they just said, you know what, there's a grate over the floor, we let them go to the bathroom and a hole in the floor. What difference is a hole in the floor if you can't flush the toilet? It's the same situation if you can't flush the toilet as going in a hole in the floor, if it's all going to remain in the toilet. They talked about Wilson with the Northern District, which feces were on the toilet, and they had no ability to clean them. Well, if the feces is in the toilet or on the toilet, what's the difference? You can't clean it, you can't get rid of it, you can't evacuate it. It's the identical situation we're faced with. And then you have the two cases out of the Seventh Circuit. You have Jackson and Johnson. Jackson was summary judgment, and the most important thing to point out, as Your Honor pointed out, we're dealing with summary judgment on most of these cases. This is not a 12B6. And even on summary judgment, the courts reversed and said, you know what, the black flies that was in Jackson where the water was unfit, you had flies and vermin coming because of the collection of water, and that said that that constant smell of feces was not akin to being in a humane condition. This is not what we're supposed to do. I mean, if this case were to go forward, we'll see, there's a lot of discovery that you're going to need to be able to show that this was an unreasonable plan. But, yeah, it's 12B6. And Johnson is the three days, and it was summary judgment versus Pelker. That's the Seventh Circuit where they didn't have running water and they had the feces on the wall. Counsel seems to make a difference whether the feces is on the wall or in the toilet. They were subject to the feces and being exposed to the vermin that come with it. It's the exact same situation we're faced with. And the saddest part about this is the secondaries on the water aspect is when people ask for more water because they're either taking medications or they're feeling dehydrated, they punish them by putting them on lockdown. And what does the lockdown do? It puts you back in your cell where you can't flush it. So the part where they kept them at night says you can't flush your toilets. If you're on lockdown, you're again not flushing your toilet. So when they ask for help, ask for a remedy for more water, they then decided to punish them by doing that act. That's not the way we treat pretrial detainees, or we should treat anybody, frankly. And that's really what we're dealing with here. And we may visit again if they think that the allegations don't support it, but it's not at this stage. Okay. Thank you. Well, thank you very much. Mr. Brice, I'll let you wrap up. The last point, I would say this with regards to the cases. He addressed several of them. What none of the cases talk about, or almost none of them, is whether there was a legitimate government purpose to the water shutoff or to the conditions that arose, I should say. And that distinguishes almost all of the cases we're citing. There's a core 20 cases on sanitation from this fact pattern, where there's a clear plan and a proper government purpose to improve the facility. The cases he's citing, nobody is going to talk about a proper government purpose when there's feces and blood on the walls. Nobody is going to come into this court and say, well, we had a proper government purpose for that. But here, we've got a complaint, short time period, short time frame. We've got a plan executed by the jail. The challenge is not to the water shutdown per se. It's to the conditions. As it must be. The conditions to get the inmates through that water shutdown. I think that's the focus of the claim. Absolutely. And so when we look at those conditions, we have to compare them to the cases. I take your point that just shutting off the water does not trigger a constitutional debate. That would be silly. It's the conditions that arise as a result of it. But in light of the proper governmental purpose, we look at these conditions, we compare them to the cases, cases which are rarely talking about whether there was a legitimate government purpose. And we look at here and we see that the conditions are, I submit, not nearly as severe as in the cases. And we have a proper purpose. How long was this plan? What does the record reflect about the plan you call reasonable, Mr. Rice? What does the record reflect about how it was created? Yeah, you keep talking about this reasonable. What's the plan? Improve plumbing? What's the plan? It's hard to get from the briefs exactly what you were trying to do here. So what was being done was there was a booster pump in the basement that was being switched out. It was past its useful life and had to be replaced. Now, again, not in the complaint, but you can derive that there was a plan. That's a specific of why the plan went into effect, but the plan is inferable from the fact that there's barrels brought up. Yeah, but the plan to improve the physical plant may in the abstract be a reasonable plan. It's the implications of what flows from that plan on whether or not it's a reasonable plan. In the abstract, no one can quarrel with, quote, improving it over a period of time. Well, that's exactly right. As Judge Flom is saying, you can have the plan to replace the water pump, but why didn't you rent it like they do for Lollapalooza, go out and rent some porta potties for people so they had an acceptable place to do their business? There are lots of things you could have done, and what we don't know on this record is why the plan that was chosen was chosen and its implications. Yeah, and I don't mean to suggest that a legitimate governmental purpose is a get-out-of-jail-free card. It's not, of course. You're making the argument that it's a total shield if it's, quote, a reasonable plan. I mean, what if you shut off heat for a week in the winter? Yeah, objectively unreasonable. I would say that is completely objectively unreasonable, unless there's some mitigating circumstance. I don't know what that would be. Perhaps it was 70 degrees the whole week. But here we've got the mitigating circumstances plugged right into the complaint. We've got bottles of water. We've got barrels of water. We've got a plan that's part and parcel of the complaint, plus we have a legitimate government purpose. And those two things together are what make the defense, so to speak, not the fact alone that there's a legitimate government purpose. All right. Thank you very much. Thanks to both counsel. We'll take your case under advisement. All right.